IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 1:98cr74-MHT |
| ALEX TYRONE McNAIR | ) | (WO) |

OPINION

In 1998, defendant Alex Tyrone McNair was convicted
of the federal offense of distribution of cocaine base
and sentenced to 65 months in custody, followed by five
years of supervised release.  After two revocations of
supervised release followed by in-custody sentences, one
in 2004 and the other in 2006, this criminal case is
again before the court, this time on a petition to
revoke McNair's supervised release for committing a
"state crime" on December 24, 2007.  Since that petition
was filed on January 3, 2008, this case has had a
lengthy and complicated procedural history.  After
multiple hearings and continuances--primarily the result

of questions about McNair's competency and sanity, as
well as the inability of defense counsel to provide
crucial evidence related to McNair's mental health--this
court held its "final" hearing on the revocation
petition on October 28, 2008.

For the reasons that follow, the court holds that
McNair should be found not guilty of the offense charged
in the revocation petition but that the conditions of
his supervised release should be modified in the manner
outlined in this opinion.

## I. Factual Background

On December 23, 2007, Gabrielle White gave birth to
McNair's child at a hospital in Birmingham, Alabama.
McNair had stayed with White in the hospital for several
days, sleeping in the room with her, and he remained
with her the night of the birth.  The next day, McNair's
behavior became extremely bizarre.  He came into White's
hospital room and began calling her names, including

"Lucifer."   McNair told White that he could "see through" her.  McNair's strange behavior continued, and he eventually attacked White, pulling her hair, hitting her in the face, and knocking her to the floor.  White testified that this behavior was completely out of character for McNair and that nothing had precipitated the outburst.

The officer responding to the scene testified that McNair "seemed to be not mentally all there."  McNair was calm and cooperative with officers, but he was not able to articulate fully the answers to their questions. He continued calling the victim "Lucifer," and he spoke erratically.  McNair himself has no recollection of the incident.

McNair has a long history of mental health problems, including, but not limited to, auditory and visual hallucinations, depression, amnesia, and post-traumatic stress disorder.  McNair and his family confirm that his behavior is far more normal when he is

taking anti-psychotic medication, but McNair claims that prior to the incident he had been off medication for two years.

Several of McNair's long-term symptoms worsened after he was shot in 2003, and McNair's family and White separately confirmed episodes of strange behavior prior to the incident that is the subject of this proceeding. McNair's sister reported that McNair would often refer to himself as Jesus, saying that he was doing the Lord's work.  White reported that McNair wanted to name their child "Jacob" because a prophet had spoken to him.  The day before the incident, McNair and White had a disagreement about the name of the child on the birth certificate.  The day of the attack, however, the two had a pleasant interaction until McNair reentered the room and became violent without warning.

The mental-health expert, Dr. Catherine Lee Boyer, testified in detail and submitted a written report to the court after examining McNair's lengthy medical

records and interviewing him in person on multiple occasions. Dr. Boyer concluded that McNair "was clearly experiencing an abnormal and psychotic mental state at the time of the offense." Boyer Report (Doc. 138), at 10. She explained that by McNair's "bizarre logic," it would make sense to think of White as "evil" if she were preventing the baby from having the name given by the prophet. Id. at 11. Dr. Boyer thus concluded that McNair would not have appreciated the wrongfulness of his actions if he believed that he was attacking the devil on behalf of God.

Dr. Boyer also concluded that McNair's history of substance abuse was not the cause of his extreme symptoms, and, indeed, it was far more likely that McNair had turned to drugs as a result of his mental illness. Such a conclusion is far more consistent with both the chronology and severity of McNair's symptoms. Dr. Boyer's detailed testimony and report include a more

complete record of the mental-health problems from which McNair has suffered.

## II. Procedural Background

McNair was arrested on December 24, 2007.  He was charged with Domestic Violence, Third Degree, which is a Class A misdemeanor in Alabama.  1975 Ala. Code § 13A-6-132.  McNair has been in federal custody for over 11 months, serving a sentence imposed in a separate matter.  Now before the court is, essentially, the issue of what effect, if any, the events of December 24 should have on McNair's status after his upcoming release from custody in that other matter.  This opinion addresses that question.

## III. Discussion

This court must first determine if McNair has violated the conditions of his supervised release.  The petition alleges that McNair violated a mandatory

condition of his supervised release by committing
"another federal, state, or local crime" on December 24,
2007. Because the circumstances surrounding McNair's
arrest for Domestic Violence, Third Degree, raise
significant questions about his sanity at the time of
the offense, this court must address whether and how
McNair's sanity is actually relevant to the
determination of whether he violated this condition of
his supervised release.

At the outset, it is important to provide some
background about the use of the insanity defense in
revocation proceedings. Several federal courts have
held that the insanity defense, as provided in 18 U.S.C.
§ 17, is not available in revocation proceedings dealing
with the violation of a condition of probation or
parole. See United States v. Brown, 899 F.2d 189 (2d
Cir. 1990) (refusing to allow insanity defense in
probation revocation); Steinberg v. Police Court of
Albany, 610 F.2d 449 (6th Cir. 1979) (applying similar

7

reasoning in parole context). These courts have noted that revocation proceedings typically consist of two stages. See Black v. Romano, 471 U.S. 606, 611 (1985) (noting that, because of due process requirements, "the decision to revoke probation typically involves two distinct components: (1) a retrospective factual question whether the probationer has violated a condition of probation; and (2) a discretionary determination by the sentencing authority whether violation of a condition warrants revocation of probation").

According to these courts, in the first of these stages the court simply determines whether there has been a technical violation of the conditions. At that stage, "[w]hat is important is whether the [defendant] violated his [conditions], not whether he did so voluntarily." Steinberg, 610 F.2d at 452. At the second stage, the court determines the disposition of the case--whether to order revocation--given that there has been

a violation of conditions.  It is only at this latter
stage, the argument goes, that questions of
voluntariness and culpability enter the calculus.[1]
Thus, while insanity is unavailable as a defense to a
violation, the underlying mental health issues and
degree of culpability are considered important for
determining a proper course of action.  See, e.g.,
Brown, 899 F.2d at 194 ("Lack of volition, while not a
defense to revocation, is often a factor pertinent to

---------------------------

     1.   Statutory law on this question is ambiguous.  The
insanity defense applies "to a prosecution under any
Federal Statute" if the defendant was insane "at the time
of the commission of the acts constituting the offense."
18 U.S.C. § 17.  Nothing in this statute explicitly makes
the defense available or unavailable in revocation
proceedings, although the question turns on the
interpretation of the words "prosecution" and "offense."
Moreover, 18 U.S.C. § 4241, which governs competency
determinations, explicitly applies equally to trials and
postrelease proceedings.  However, nothing in that
statute--which links revocation hearings and trials for
the purpose of competency determinations--explicitly
links these different proceedings for the purpose of the
insanity defense.

the disposition of a revocation proceeding.") (internal citation omitted).

One problem with this analysis is, of course, that there are instances in which revocation is mandatory once a violation is found.  See 18 U.S.C. § 3583(g). This situation eviscerates the second stage and could, in practice, mandate significant prison time to be imposed for conduct completely outside the control of the offender.[2]   Because there are important

---

2.  Part of the rationale underlying these opinions appears to be the belief that a violation of a condition, whether voluntary or involuntary, would signify that supervised release is not serving the purpose for which it was intended.  Because the punishment is imposed not for the violation, but pursuant to the previous criminal conviction, these courts have found it unnecessary to require criminal responsibility in all cases of revocation.  This formalism simply ignores, however, that significant liberty interests are at stake no matter how the proceeding is styled.  It also ignores that some sort of criminal responsibility is, for our legal system, deeply linked to the justness of any potential punitive responses.  The court also wonders if this absolute pronouncement about voluntariness suggests that other defenses, such as duress, would also be unavailable; if so, such a result could obviously lead to anomalous
(continued...)

constitutional interests implicated in these determinations about a person's liberty, the procedures at revocation hearings must be fundamentally fair. <u>See</u> <u>Bearden v. Georgia</u>, 461 U.S. 660, 668-69 (1983). It would seem fundamentally unfair, however, to order revocation if, for example, someone was forced at gunpoint to possess marijuana, thus technically violating a condition of her release.

The goal of supervised release and its concomitant revocation and modification hearings is to craft a viable alternative to incarceration, helping the offender rehabilitate and reducing the strain on a penal system of scarce resources. The long tradition of discretion afforded to the decisionmaker at these proceedings highlights a culture of calibration--an attention to the idiosyncracies of individual cases. It is true that when the court has discretion at the second

---

    (...continued)
outcomes.

11

stage, it can in practice order relief similar to what
it could have ordered had it been allowed to make the
determination based on insanity or voluntariness at the
first stage.  Most judges, then, could usually achieve
the outcome consistent with their best judgment.  When
the court lacks discretion, however, the first stage may
become a crucially important step in crafting a fair,
rational, and above all, effective response to
nonconforming conduct.[3]

Because of the unique challenges posed by mental
illness, discretion to design appropriate responses to
violative conduct is particularly important, and any

---

3.  When revocation is mandatory, it could be argued
that the violation is more criminal and punitive in
nature, thus triggering different procedural and
substantive requirements in order to establish the
violation.   In fact, because mandatory revocation
violations generally require the commission of a new
substantive offense,  it may be more reasonable to imply
affirmative defenses to that already criminal conduct.

rule removing that discretion completely in a certain

class of revocation proceedings would be problematic.[4]

The exact substantive and procedural requirements

of a supervised release revocation hearing, then, may

turn on the kind of violation alleged (i.e., whether

revocation would be mandatory) as well as on the reason

_____

4. In developing the standards of fundamental fairness, the Supreme Court has not addressed the question of whether the insanity defense might apply to revocation hearings.  In Bearden, the Court held that an indigent probationer could not be imprisoned for failure to pay a fine because it was "fundamentally unfair to revoke probation automatically" when the failure to obey the condition occurred "through no fault of his own." Bearden, 461 U.S. at 668.  Despite the importance of the lack of fault to its holding, the Court complicated matters in a footnote, in which it suggested that revoking probation would not always require a finding of fault.  The Court gave the example of "a condition like chronic drunken driving," which was itself  a "threat to the safety [and] welfare of society."  Id. at 669 & n.9. This seems to suggest that a key question would be whether the "condition" at issue here--psychiatric problems--is itself a "threat to the safety or welfare of society."  In that case, it may be acceptable to revoke probation even if there were no evidence of criminal fault.  It is important to note, however, the contextual and ungeneralizable nature of this analysis.

that lay behind the violation (_i.e._, indigence or mental illness).

While the court notes significant potential problems with a blanket rule depriving defendants in revocation proceedings of defenses that negate culpability, this case does not provide the opportunity for the court to delve further into these difficult questions of statutory interpretation, constitutional mandate, and general prudence. In this case, the violation with which McNair is charged itself provides him with the defense of insanity.

The petition charges McNair with committing a crime in Alabama. McNair could not have committed this crime, however, if he was insane as defined by 1975 Ala. Code § 13A-3-1. In other words, the inquiry into McNair's sanity is, by definition, relevant at the first stage described in <u>Brown</u>, <u>Steinberg</u>, and <u>Romano</u>. Unlike other violations of supervised release, which would merely require McNair to avoid certain conduct (such as leaving

14

the country or quitting a treatment program), this
condition requires McNair to avoid breaking the law.  If
Alabama would not consider McNair guilty of breaking its
law, then McNair has not violated his supervised
release.   Thus, McNair's sanity becomes critical in
determining the "retrospective factual" issue of whether
a condition was violated, see Romano, 471 U.S. at 611,
and not as a defense once the elements of a supervised
release violation have already been established.[5]

McNair was arrested for Domestic Violence, Third
Degree, pursuant to 1975 Ala. Code § 13A-6-132.  There
is overwhelming evidence that McNair's conduct satisfied

_____

5.  The court would still be forced to decide
definitively whether to apply the federal insanity
defense if Alabama did not make that defense available
for the crime with which McNair is charged.  Similarly,
if the content of the state and federal defenses differed
substantially, and the court found McNair sane under
Alabama law, it could be forced to make a determination
of McNair's sanity under federal law.  As it is however,
because the defense is available under Alabama law, the
court chooses not to rest its opinion on the application
of the federal defense (18 U.S.C. § 17).

the elements of that offense when he pulled White's hair and struck her in the face, knocking her to the floor.

Under § 13A-3-1, McNair is not guilty by reason of insanity if, "as a result of severe mental disease or defect, [he] was unable to appreciate the nature and quality or wrongfulness of his acts."[6]  The elements of this defense are nearly identical to the federal insanity defense.  See Archie v. State, 875 So.2d 336, 340 (Ala. Ct. Crim. App. 2003).

In Herbert v. State, 357 So.2d 683 (Ala. Ct. Crim. App. 1978), the defendant shot and killed his wife because he believed that she was possessed and that she was controlling his mind.  The court noted that the expert found the defendant insane and that there was no

---

6.  Alabama would require McNair to prove these elements by clear and convincing evidence.  1975 Ala. Code § 13A-3-1.  However, the burden of proof at revocation hearings is a preponderance of the evidence. In any case, as described below, the evidence of insanity is overwhelming, and the court would find McNair insane under either standard of proof.

16

evidence to rebut the evidence of insanity.  Similarly,
here, there is simply no evidence to rebut the
overwhelming evidence of McNair's insanity.  Both White
and the responding officers testified that McNair did
not appear mentally lucid.   White testified that
McNair's conduct was completely out of character and
unprecipitated.  McNair himself has no recollection of
the incident, and both White and McNair's family report
similar incidents of bizarre, irrational behavior.
Moreover, McNair's clinical history suggests lengthy
battles with various mental-health issues, and Dr.
Boyer, after reviewing those records and examining
McNair, determined that he suffered from serious mental
defects at the time of the offense and likely did not
appreciate the wrongfulness of his conduct.  There is
simply no meaningful evidence to contradict this
thorough analysis.  The evidence establishes that, at
the time of the offense, McNair suffered from a serious
mental disease, and Dr. Boyer's analysis of McNair's

17

motivation to fight the devil who stood in the way of what the prophet had ordained is the only credible explanation for conduct that no one else, including the victim, can explain.

As a result, the court holds that McNair is not guilty of committing the state crime charged in the revocation petition, that is, Domestic Violence, Third Degree, because he was unable to appreciate the nature and quality and wrongfulness of his conduct. However, while McNair is not guilty by reason of insanity, the evidence at the hearing (including testimony from the defense's own expert) leaves the court with serious concerns about McNair's behavior and, as a result, the appropriate conditions of his supervised release.

## IV.  Modifications

The evidence before the court also demonstrates that McNair has responded well in the past to intensive treatment.   In her report, the defense's expert

recommends inpatient treatment at a dual-diagnosis facility for a period of three-to-six months. Pursuant to this court's direction, counsel for McNair has developed a detailed treatment plan that is consistent with the recommendations of Dr. Boyer.

This treatment plan contains conditions that the court finds particularly important. These include: McNair's enrollment in an intensive inpatient-dual-diagnosis facility that will allow him to receive treatment for both his mental illness and his substance abuse; McNair's eventual transfer to the residential program of this treatment facility, at which he would be required to obtain employment in the community and to contribute to the cost of his treatment; and a full psychiatric evaluation by the University of Alabama Birmingham Community Psychiatry Department.

It is worth emphasizing, however, the flexibility of this treatment process. Because of the nature of the problems with which McNair is dealing, a treatment plan

19

developed in advance should be subject to the best
judgment of those most involved in McNair's care--those
best able to assess his progress and his needs.  While
the treatment plan submitted to this court contains some
exact time periods and other details, this opinion
should not be viewed as mandating strict adherence to
those details if McNair and those responsible for his
treatment feel that substantial progress has been made
or is best achieved in a different way.

The United States Probation Office will monitor
McNair's treatment closely, and the court remains
interested in and hopeful about McNair's progress.  Even
though the court has supervisory authority over McNair
pursuant to this case for only approximately another 11
months, McNair's counsel suggests that McNair's
treatment program could last for substantially longer.
Counsel has submitted to the court that the treatment
developed for McNair can be made a part of his
conditions of supervised release in the separate matter

for which he is now imprisoned.  The court leaves that determination to the best judgment of those involved in McNair's long-term treatment; McNair and the government may want to file a joint motion in his other criminal case to make the treatment program a part of his supervised release there.

Nonetheless, when McNair is released from custody in the separate matter, his supervising probation officer should ensure that he begins intensive inpatient treatment in this case immediately.

***

By separate order, the court will set another hearing so that, absent objections from the government or McNair or both that warrant different relief, the court can orally impose the verdict and relief outlined above and then enter an appropriate judgment.

DONE, this the 4th day of December, 2008.

        /s/ Myron H. Thompson
        UNITED STATES DISTRICT JUDGE